## CHARLES A. PETERSON AND ANOTHER v. JOHNSON NUT COMPANY.[1]

No. 32,588.

March 7, 1941.

[1]Reported in 297 N. W. 178.

See 204 Minn. 300, 283 N. W. 561.

*Malmberg & Nelson* and *Kingman, Cross, Morley, Cant & Taylor,* for appellants.

*Chester W. Johnson* and *Dan J. O'Connell,* for respondent.

HOLT, JUSTICE.

Action to enjoin defendant from competing in business with plaintiffs in certain territory. Findings of fact and conclusions of law were for defendant, and plaintiffs appeal from the order denying a new trial.

A former appeal in this action is reported in 204 Minn. 300, 283 N. W. 561. The controlling legal questions were there exhaustively treated and determined. So determined, they became the law of the case to be applied upon the new trial. 1 Dunnell, Minn. Dig. (2 ed. & Supps.) §§ 398, 404, 454; First State Bank v. First State Bank, 172 Minn. 223, 214 N. W. 781. The issues are quite fully stated in the former appeal, and it is deemed sufficient for a decision of this appeal to give a mere summary of the undisputed facts.

In 1922 the plaintiff Peterson, J. C. Johnson, now the president of defendant, and some others organized the defendant corporation

with its principal place of business in the city of Minneapolis, this state. Its business was dealing in nut meats. The business prospered, and a branch was established at Cleveland, Ohio, plaintiff Peterson being in charge thereof. By a contract dated February 10, 1927, defendant sold to Peterson, for a consideration of more than $87,000, the business, property, and assets of the Cleveland branch, including the good will. This contract contains the covenant upon which this action is based. It reads:

"(4) The Company [defendant] agrees that it will not enter into competition with Peterson in the territory hereinbefore described [roughly speaking the territory east of the Mississippi River], either directly or indirectly. Peterson agrees that he will not enter into any competition with the Company in any territory not specifically granted to him, either directly or indirectly, subject, however, to the following provision: Peterson may do a jobbing business in raw nuts in any territory in the United States, except in the states of Minnesota, Wisconsin, the Northern Peninsula of Michigan, North and South Dakota, Iowa, Montana, Wyoming, and Colorado, but may not maintain any office except in his territory, as described in Paragraph '2.' With respect to those states it is understood that he may do such a jobbing business in Duluth, Minnesota, Sioux City, Iowa, La Crosse, Wisconsin, Milwaukee, Wisconsin, Sioux Falls, South Dakota, and Denver, Colorado, without maintaining an office in said cities."

We also add this paragraph of the agreement:

"(14) It being understood that Peterson expects to organize a corporation for the purpose of conducting the business at Cleveland, it is specifically agreed that this contract may be assigned to such corporation upon assuming the obligations of this contract, but such assignment shall not release Peterson from his obligation hereunder."

Pursuant to this last clause, the corporation of The Peterson Nut Company was formed under the laws of Ohio, and Peterson assigned to it all rights and property acquired under said contract

with defendant. The two corporations conducted their respective businesses in the territory alloted to each, and respected the covenant against competing in the territory of the other, until The Peterson Nut Company was adjudged a bankrupt in an involuntary proceeding. Its assets and good will were in the proceeding sold to one Schiele of Cleveland for $3,613.10. By transfer from Schiele, such assets, including good will, are now held by the plaintiff corporation. Because the name of the plaintiff corporation is the same as the one adjudged a bankrupt, the former, in the first appeal and in the two trials below, was designated as Peterson Nut Company No. 3 and the latter as Peterson Nut Company No. 2. If necessary to distinguish the two the same plan will now be followed.

We think the former appeal determined every legal proposition against defendant and left only one issue of fact raised by the answer for trial, namely, whether the Kelling Nut Company, a corporation, is the real party in interest. The contract from which the covenant is quoted was prepared by an able lawyer; it was signed, witnessed, and acknowledged by both parties. Its language is clear and unambiguous. We held that injunction restraining defendant from violating this covenant was the proper relief; that the mutual covenant was valid and binding; that the bankruptcy of Peterson Nut Company No. 2 was not an anticipatory breach of the covenant; that the covenant passed with the sale of the assets and good will of the bankrupt to the purchaser Schiele, and from him to Peterson Nut Company No. 3, the plaintiff corporation. The various phases of these propositions were so thoroughly discussed and fortified by cited authorities that nothing need be added.

The findings of fact and conclusions of law on the retrial indicate that little heed was paid to our decision. The findings of fact are exceedingly prolix and are, on this appeal, attacked as unsupported by and contrary to the evidence. It will be sufficient to consider only the fifth finding of fact attacked, the substance of which is that the bankruptcy proceedings of Company No. 2 "had

the effect of terminating and did terminate the contract of February 10, 1927." The finding is also that both defendant and Company No. 2 adopted a practical construction that the contract was in all things terminated by the bankruptcy, and finally: "The bankruptcy of Company No. 2 was an anticipatory breach of this personal executory contract, both as a matter of law and fact." This finding overturns every legal proposition established by our former decision. The memoranda attached to the findings and to the order denying plaintiffs' motion for a new trial indicate plainly that in making the findings the law of the case was disregarded. We quote from the memorandum to the order denying a new trial:

"This court is clearly of the opinion that the bankruptcy of Company No. 2 which occurred in August, 1934, had the effect of terminating and ending the contract. It was the intention of the parties, as disclosed by their statements, acts and conduct, that bankruptcy would and should have such effect. Such was the practical construction of the parties. The court is of the opinion that in legal effect it makes little difference whether we consider the bankruptcy proceedings as having the effect of terminating and ending the contract of February 10, 1927, or whether we consider that such bankruptcy was, as a matter of fact, an anticipatory breach of the executory personal contract."

Oral testimony was received over objection that it was incompetent and hearsay as to the talk and understanding of the parties to the contract of February 10, 1927, with reference to the effect of bankruptcy; also declarations of Peterson both oral and in writing made to others after the bankruptcy of Company No. 2, and both while he had some connection with Company No. 3 and after severance thereof. We shall not point out or discuss every erroneous ruling upon the reception of this incompetent and hearsay evidence; but direct attention to only a few of the more flagrant violations of settled rules of evidence.

Oral testimony is inadmissible to vary the terms of a written contract which is formulated in clear and unambiguous language.

Such a contract is not open to construction, and oral testimony to vary or alter the meaning was incompetent and inadmissible. 2 Dunnell, Minn. Dig. (2 ed. & Supps.) § 3368. There is no suggestion in the contract to any event of bankruptcy. No sane person could infer that insolvency or bankruptcy would disable or tend to disable one from keeping a covenant not to compete with the other party to the contract. Another well settled rule of evidence was disregarded, so far as concerns the plaintiff corporation, in admitting statements and declaration of Peterson after he had transferred his rights to Company No. 2, in disparity of the title transferred. 2 Dunnell, Minn. Dig. (2 ed. & Supps.) § 3417; True v. Citizens Fund Mut. F. Ins. Co. 187 Minn. 636, 246 N. W. 474. So, also, the rule that declarations of an official or agent of a corporation are inadmissible against the corporation unless made within the scope of the authority of the official or agent and while transacting the business of the corporation. 2 Dunnell, Minn. Dig. (2 ed. & 1932 Supp.) § 3418; Longman v. Anderson, 160 Minn. 15, 199 N. W. 742. The only evidence from which any inference of practical construction is to be found was in the activity of Peterson, after bankruptcy, to make new business arrangements for himself with others. Up to the bankruptcy of Company No. 2 in 1934, there is not any evidence of any violation of this covenant by anyone bound thereby. It might be stated that the record is clear that defendant kept the same up to the latter part of September, 1937; and there is no valid proof of any substantial violation thereof by the plaintiff corporation or its predecessor in title at any time.

The lengthy findings of evidentiary matters stated in findings 4 and 6 to 15, inclusive, each of which is attacked as unsupported, will not be set out because in our former decision the substance of those findings was disposed of. The record of 240 pages has not been materially changed by any competent evidence in the 343 pages added thereto by the last trial. On the former appeal it was settled that the covenant was valid and binding upon defendant; that Peterson's rights under the contract containing the bilat-

eral covenant passed to Company No. 2; that the covenant survived the bankruptcy and passed by the sale therein to Schiele, and from Schiele to the plaintiff corporation. The law leading to that result from the facts established by competent evidence was, as before stated, so fully discussed from every angle of attack, including the findings now challenged by the plaintiff corporation, that we refrain from attempting to add anything thereto.

The 16th finding, that plaintiffs offered no competent evidence of damages, is also challenged as not sustained. The president of defendant was called by plaintiffs. He admitted that defendant invaded the territory protected by the covenant in the latter part of September, 1937, and sold therein, up to December 18, 1937, when the restraining order issued, goods to the aggregate amount of $8,362.82, and he admitted that six per cent thereof could fairly be taken as the profit defendant made. That testimony does not justify a finding that the plaintiff company was not damaged. We think it would support a finding of damages at least in the sum of $500.

As already stated, our former decision left for trial the issue of fact alleged in the answer that the Kelling Nut Company of Chicago had acquired all the rights of the plaintiff corporation and was the real party in interest in the cause of action. The court did not find upon this issue, deeming it unnecessary in view of its other findings. We have examined the whole record and find no competent evidence proving or tending to prove that the Kelling company ever acquired any rights in or to this covenant. No officer of that company gave any testimony, nor was there any document offered in evidence of a transfer from the plaintiff corporation of any interest in this covenant, held in our former decision to be that of the plaintiff corporation. The basis for the alleged defense is traced to this: Donald Kelling, the president of plaintiff corporation, who had worked for defendant and for Peterson Nut Company No. 2, and also for some time for the Kelling Nut Company of Chicago, and was acquainted with its president, Max Kelling, obtained a loan of $9,000 from Max Kelling personally

for the purpose of buying from Schiele and associates the property and good will of the bankrupt Peterson Nut Company No. 2, acquired by the purchase from the trustee in bankruptcy. In connection with the transaction, the Peterson Nut Company No. 3 had been organized and a certain amount of its stock issued to one Teschner, an attorney, who held it in trust to secure Max Kelling for the loan. It had been arranged between Donald Kelling and Max Kelling that the latter would accept some machines, transferred in the sale of the trustee in bankruptcy of Company No. 2, as payment of the loan in the sum of $4,500. The balance of $4,500 was paid from a loan obtained by Donald Kelling from one Holmes. The two Kellings were not related. There is not one particle of competent evidence that either Max Kelling or the corporation of Kelling Nut Company has any interest in the plaintiff corporation or in the covenant in suit. That the Kelling Nut Company is interested in having defendant excluded from the territory wherein it operates does not make it in law or fact a real party in interest in this action within the purview of 2 Mason Minn. St. 1927, § 9165; Winona & St. P. R. Co. v. St. Paul & Sioux City R. Co. 23 Minn. 359.

We think this litigation should end. The order denying a new trial is reversed and the cause is remanded with direction to amend the findings of fact in conformity with this and the former opinion of this court, and so that the conclusion of law will direct the injunction against defendant to issue as prayed in the complaint, and award damages to the plaintiff corporation in the sum of $500.

UPON APPLICATION FOR REARGUMENT.

On March 28, 1941, the following opinion was filed:

PER CURIAM.

In an action at law for wrongful interference with a business, the measure of damages is the loss shown to the business. But in an action in equity to enjoin the violation of a covenant not to compete in a given territory there may be an accounting for the profits gained by the violator of the covenant. Such illegal profits

478

may properly measure the damages. Here the president of defendant testified that not less than $500 was the profit defendant reaped by a violation of the covenant. Equity, having assumed jurisdiction and granted an injunction, will, as an incident, give full relief and compel an accounting of the *profits* wrongfully obtained. Wright v. Scotton, 13 Del. Ch. 402, 121 A. 69, 31 A. L. R. 1162; Patterson v. Glassmire, 166 Pa. 230 (as reported in 31 A. 40, where the full report of the master, whose decision was approved, is printed and considers the authorities for holding that the profits, made by the violator of such a covenant as this, may furnish the measure of damages).

The petition for reargument is denied.

