CHERNE INDUSTRIAL, INC.,
Respondent,

v.

GROUNDS & ASSOCIATES, INC., et al., Appellants.

No. 48046.

Supreme Court of Minnesota.

April 6, 1979.

Oppenheimer, Wolff, Foster, Shepard & Donnelly and Elmer B. Trousdale, St. Paul, for appellants.

Lapp, Lazar, Laurie & Smith and Gerald T. Laurie, Minneapolis, for respondent.

Heard before ROGOSHESKE, PETERSON, and YETKA, JJ., and considered and decided by the court en banc.

YETKA, Justice.

This is an appeal by defendants Grounds, Watkins, Peterson, and Grounds & Associates, Inc., from judgment ordered by Ramsey County District Court on June 10, 1977, and entered on July 28, 1977, awarding plaintiff Cherne Industrial, Inc., a permanent injunction restraining defendants from rendering services for a period of 2 years to Cherne's former or prospective customers, compensatory damages in the amount of $39,322.50, and punitive damages in the amount of $10,000 (against Grounds and Grounds & Associates, Inc.). The injunction was amended on July 7, 1977 to include only seven specifically named firms. Plaintiff-respondent filed a notice of review concerning the district court's denial of attorneys fees. We affirm.

The legal issues raised on this appeal are as follows:

1. Did the defendants breach their employment agreements by competing with plaintiff after termination of their employment?

2. Did the trial court err in finding that defendant had used confidential data and trade secret data taken from plaintiff?

3. May an injunction to enforce a covenant not to compete be issued after the contractual period of the covenant has expired?

4. May an injunction forbidding future conduct be used as a remedy for past use of confidential information where that information has lost its confidential character?

5. May an injunction forbidding future conduct be granted without a specific finding of irreparable injury?

6. Does an injunction limiting future preparation of operations and maintenance manuals operate as a prior restraint on defendants' First Amendment rights of free speech and expression?

7. Were the compensatory damages awarded to plaintiff consistent with the law and supported by the evidence?

8. Was the award of punitive damages against two of the defendants consistent with the law and supported by the evidence?

9. Was plaintiff entitled to attorneys fees as part of its recovery?

Plaintiff Cherne Industrial, Inc., was incorporated in 1960 and is involved in producing and distributing various products and services related to the sewage treatment industry. In 1969, after a Federal law was enacted requiring all newly constructed sewage treatment plants to have an operations and maintenance manual ("O & M manual"), Cherne began to develop the business of producing and marketing these manuals. It was one of the first entrants into this business on a national basis.

Cherne developed its own general format for the O & M manuals and internal standards for production. Federal regulations at that time were only one page in length. Cherne drafted a sample specification for its manuals and distributed it to consulting engineers, who purchased the manuals for the sewage treatment plants they designed.

To market O & M manuals, Cherne relied on its national network of independent representatives to compile lists of consulting engineers who might purchase an O & M manual from Cherne. Over a number of years, Cherne isolated and categorized engineers who were customers or prospective customers for O & M manuals.

Cherne was in the O & M manual business about 2 years before receiving its first order. During each of its first 5 years in the O & M manual business, from 1970 through 1974, Cherne lost money; its total loss was $141,224.12. Not until 1975 did Cherne make a profit in its O & M manual division.

In August or September of 1971, Cherne hired defendant Harry C. Grounds as a part-time consultant on various matters, including O & M manuals. Grounds is an engineer, registered in Minnesota and in three other states, and has a Bachelor of Science degree in civil engineering. Prior to working for Cherne, Grounds had never prepared an entire O & M manual and had never been in the specific business of pre-

paring O & M manuals. On January 8, 1972, Grounds began working full-time for Cherne as an engineer and eventually became a vice president in charge of the O & M manuals division. Grounds' full-time employment at Cherne lasted until February 4, 1974, when he went into his own business; he served as a part-time consultant to Cherne on O & M manuals until June 20, 1974.

Defendant Paul R. Watkins was hired by Cherne on February 3, 1973, and became national sales coordinator for the O & M manual business. As national sales coordinator, Watkins was involved in supervising approximately 35 independent representatives of Cherne who were involved in selling O & M manuals. Watkins went with the representatives to call on customers and developed and taught methods of merchandising the O & M manuals. During the course of his employment, Watkins had extensive contacts with customers, Cherne representatives, and state and Federal regulatory agencies with approval authority over O & M manuals. Prior to working for Cherne, Watkins had no experience in the O & M manual business. Watkins voluntarily terminated his employment at Cherne on or about October 1, 1974, and went to work for Grounds on or about November 12, 1974.

Defendant Bruce Peterson was employed at Cherne Industrial, Inc., from October 16, 1972. He was hired as a coordinator for the O & M manual department at Cherne, and at the time of his termination he was a project manager of the technical production of O & M manuals. Peterson had no prior experience in the O & M manual area before going to work for Cherne. Peterson went to work for Grounds on or about March 12, 1975.

It was Cherne's policy to have its key employees sign an employment agreement requiring them never to use or disclose any confidential information, prohibiting them from taking such information from Cherne upon termination of employment, and restricting their right to compete with Cherne for 2 years with respect to its products or services. All three defendants signed such an agreement. These agreements were identical, except that Grounds' included an exception covering services rendered as a consulting engineer. The clause containing this exception was written by Grounds' attorney. Grounds signed the agreements of Watkins and Peterson as a witness.

While employed at Cherne, Watkins, Peterson, and Grounds had access to all of the records pertaining to Cherne's O & M manual business. All three took information from Cherne when they left.

Grounds testified that he had the following documents in his office from Cherne: a list of Cherne customers, a list of Cherne representatives, letters, memoranda, slides, two Cherne O & M manuals, territory evaluations, representative evaluations, and letter and phone reports pertaining to Cherne customers. Some of the memos written by Grounds were labeled "confidential."

When Watkins left Cherne, he took with him customer lists, lists of representative evaluations stamped "confidential," lists of territorial evaluations stamped "confidential," price lists stated to be confidential, costs and pricing data, technical data, correspondence and phone memoranda concerning customers, advertising materials, and an extensive chronological file of letters and documents, statistical information, financial data, a personal list of representatives of Cherne and other materials. Some or all of this confidential information was used by Watkins while soliciting business for Grounds. Watkins stated that he would not want certain confidential matters, such as prices, to fall into the hands of a competitor or a regulatory agency.

When Peterson left Cherne, he took a large volume of material such as correspondence with customers, regulatory agencies, and others, memoranda, age analysis of Cherne's accounts receivable, technical data, his chronological file, and other documents. Peterson testified that he had used some or all of this information while employed at Grounds. No one at Cherne authorized Peterson to take any information from Cherne.

Grounds and his employees developed a mailing list to solicit their own O & M manual business. Watkins used his Cherne contacts and other sources to develop this list. After joining Grounds, Peterson added to this list the names of firms and people with whom he had worked while employed at Cherne, taking these names from his chronological files. Peterson said that he, Watkins, or Grounds had contacted some of the firms on the list.

Early in 1975, a list of planned projects for which O & M manuals might be needed became available from the EPA. Defendant Watkins stated that he used such a list to compile lists of customer prospects.

On June 19, 1973, Grounds and Watkins, while both employed at Cherne, entered into a written "memorandum of understanding." The memorandum, signed by Watkins and Grounds, said, in part:

"We the undersigned, therefore mutually agree to collect and interchange data of any nature that will protect our positions and reputation should the use of such data become necessary. It is understood that such data shall not be used unless the undersigned both so agree."

Watkins said that he and Grounds had two discussions reminding each other to be conscientious about collecting data under the memorandum.

While still employed full-time at Cherne, Grounds was hired, without Cherne's knowledge or consent, to serve in a part-time capacity as an expert witness in environmental litigation that Grounds admitted could have proved embarrassing to Cherne. Grounds subcontracted some of the litigation work to his subordinate, Watkins. Some of this work may have been done by Grounds and Watkins at Cherne's office facilities at night. Grounds also did other unauthorized outside work while employed by Cherne. In addition, Grounds had contact with Dawson, Minnesota, regarding its sewage treatment plant. After he concluded his employment with Cherne, Grounds obtained a Federal grant to study the Dawson, Minnesota, plant, a grant that Cherne had been interested in obtaining. The total amount of this grant exceeded $70,000.

Prior to leaving Cherne, Grounds told all of the key personnel in Cherne's O & M manual department that if at anytime Cherne were no longer interested in the O & M manual business, and if he were in that business, he would be interested in having them join him. He also informed many, if not all, of the employees of Cherne's O & M manual division that he would assist them in finding other employment.

When he first went into his own business, Grounds operated that business as a sole proprietorship under the names of Harry C. Grounds, P.E., or Grounds & Associates. On December 16, 1975, Grounds & Associates, Inc., was formed with Grounds and his wife owning 95 percent of the stock and Paul Watkins, Bruce Peterson, and Howard Veldhuizen owning the other 5 percent of the stock. Watkins, Peterson, and Grounds were the directors of the corporation in December of 1975. The individual officers of Grounds & Associates, Inc., are Harry C. Grounds, president; Paul Watkins, vice-president; Bruce Peterson, vice-president; and June Grounds, secretary-treasurer.

During the period from April 1, 1975, when Grounds obtained his first contract to produce an O & M manual, through May 23, 1977, Grounds and Grounds & Associates, Inc., entered into O & M manual contracts in the amount of $486,675. Many of these contracts were with customers or prospective customers of Cherne about which Watkins, Grounds, or Peterson learned while employed at Cherne. The first 20 contracts and a total of 23 of the total of 40 contracts obtained by Grounds or Grounds & Associates, Inc., for O & M manuals were with Cherne's customers or prospective Cherne customers. Cherne did not submit bids on most of these contracts.

Plaintiff Cherne brought this action to enjoin defendants from using confidential information and unfairly competing with it in the marketing and production of O & M manuals and to obtain damages. Defendants asserted counterclaims totaling more than $50 million. Those counterclaims were

stricken by the district court as sham and frivolous under Rules 11 and 12, Rules of Civil Procedure. Plaintiff prevailed at a trial without a jury and was awarded an injunction and compensatory and punitive damages. The district court did not award plaintiff its attorneys fees.

1. Breach of the covenant not to compete.

The employment agreement signed by the individual defendants provides, in part:

"E. FOR a period of two years after termination of my employment by 'C'.

(a) If I have been or am employed by 'C' in a sales capacity, I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in connection with the sale merchandising or promotion of CONFLICTING PRODUCTS to any customer of 'C' upon whom I called, or whose account I supervised on behalf of 'C' at any time during the last two years of my employment by 'C'.

(b) If I have been or am employed by 'C' in a non-sales capacity, I will not render services to any manufacturer or merchandiser of a product which competes in the sales market with a 'C' product."

Plaintiff argues that O & M manuals are products and, therefore, defendants' providing of O & M manuals constitutes a breach of the employment agreement. Defendants contend that authoring these manuals under subcontract to consulting engineers is a service and therefore not forbidden by the agreement. A question is thus raised whether the term "product" as used in the agreement applies to the O & M manuals.

▪ Where the terms of a contract are ambiguous, the trial court is to ascertain the parties' intent by looking at the document as a whole and at the surrounding circumstances.[1] In the instant case, each side presented evidence to support its own interpretation of the contract and also cited numerous references by its opponent to the O & M manuals in terms contrary to the opponent's position at trial. Plaintiff, for example, produced letters written by defendant Grounds in which he alluded to the O & M manuals as a "product" and pointed to a similar characterization by him in a deposition. Defendants pointed out that plaintiff's complaint stated in various paragraphs that the O & M manual is a service and that plaintiff's advertising and contracts made similar statements. Although the evidence was not decisive, the trial court was satisfied that "there is ample evidence here each of the participants viewed the manuals as 'products' as between themselves, Cherne representatives, and others." Under Rule 52.01, Rules of Civil Procedure, "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." In order to overturn a trial court's findings, this court must be left with a definite and firm conviction that a mistake has been made, notwithstanding the evidence to support such findings. *Greer v. Kooiker*, 312 Minn. 499, 253 N.W.2d 133 (1977); *In re Trust Known as Great Northern Iron Ore Properties*, 308 Minn. 221, 243 N.W.2d 302 (1976); *In re Estate of Balafas*, 293 Minn. 94, 198 N.W.2d 260 (1972).

▪ Since there was support for the trial court's finding that the manuals are products within the terms of the contract and since the evidence against this finding was not sufficient to give this court a definite and firm conviction that a mistake has been made, the trial court's finding will be affirmed. Since the clause prohibits competition among "products" and the trial court found the manuals to be products, defendants are automatically prevented by the contract from competing with plaintiff with respect to the O & M manuals.[2]

1. *Midway Center Assoc. v. Midwest Center, Inc.*, 306 Minn. 352, 356, 237 N.W.2d 76, 78 (1975); *Donnay v. Boulware*, 275 Minn. 37, 45, 144 N.W.2d 711, 715 (1966).

2. Although restrictive covenants are usually strictly construed, they will be enforced to the extent they are reasonable. See, *Hedberg v. State Farm Mutual Automobile Ins. Co.*, 350 F.2d 924 (8 Cir. 1965); *Naftalin v. John Wood*

Defendant Grounds contends that the production of the O & M manual is a consulting engineer service and that under the terms of his contract he can freely prepare the manuals. He cites a clause contained only in his contract, which reads: "Nothing herein shall prevent me from undertaking employment as a consulting engineer after termination of employment with 'C'."

■ There was much testimony on this issue. Leo McCabe, manager of the O & M manuals for plaintiff and producer of about 20 such manuals, testified that one need not possess an engineering degree to prepare the manuals and that a nonengineer, because of his less technical background, is better able to communicate the information to the laypersons who operate the equipment. Maurice Robins, a chemical engineer who has written O & M manuals for plaintiff, agreed that they need not be done by engineers and stated that in certain respects the manuals are more appropriately the work of journalists. J. Thomas Kirk, an engineer in an engineering firm for which defendant Grounds prepared an O & M manual, testified that he considered defendant Grounds to have furnished consulting engineering work when he produced the manual. He admitted, however, that it is permissible for a nonengineer to prepare the manuals. From this testimony, it is clear that although consulting engineers can prepare the O & M manuals, the work is not necessarily that of consulting engineers.[3]

■■ It is well-established that any ambiguity in a contract will be resolved against the draftsman.[4] Since defendant Grounds' attorney drafted the clause in question, if defendant intended to include the production of manuals within the scope of the clause, he could have made that clear.[5]

2. Use of confidential data and trade secret data taken from plaintiff.

■ In order to determine whether the defendants used confidential information or trade secrets belonging to plaintiff, it is necessary to define two central concepts. The first, "confidential information," is defined in the contract as—

" * * * information not generally known, about 'C' processes and products, including information relating to research, development, manufacture, purchasing, accounting, engineering, marketing, merchandising and selling."

The other key term, "trade secret," seemingly has no universally recognized definition; however, a generally accepted one is—

" ' * * * any formula, pattern, device or compilation of information which

Co., 263 Minn. 135, 147, 116 N.W.2d 91, 100 (1962); *Combined Ins. Co. of America v. Bode*, 247 Minn. 458, 77 N.W.2d 533 (1956). Although the trial court did not address this issue, the facts on the record indicate that any restraint imposed by this contract was reasonable. Because plaintiff has only about 2 percent of the sales in the O & M manual market, defendants can solicit business from that portion of the other 98 percent with which plaintiff is not doing or seeking to do business.

3. Defendant Grounds contends that the trial court's finding that the preparation and sale of O & M manuals "is neither inherent nor common consulting engineer work" is inconsistent with its finding that as a registered professional engineer he had violated his fiduciary duty by failing to abide by the Rules of Professional Conduct and the Code of Ethics. These rules, however, apply to more than engineering work. They extend, for example, to such matters as confidentiality of the business affairs of clients and employers. In that respect they are similar to the Code of Professional Responsibility, which governs behavior of attorneys even when they are not involved in a lawyering activity. See, *In re Williams*, 221 Minn. 554, 561, 23 N.W.2d 4, 8 (1946).

4. See, e. g., *Security Mut. Cas. Co. v. Luthi*, 303 Minn. 161, 226 N.W.2d 878 (1975); *Stuart v. Secrest*, 170 N.W.2d 878 (N.D.1969); *Bacon v. Karr*, 139 So.2d 166 (Fla.App.1962).

5. Two other factors are consistent with a determination that preparation of O & M manuals is not included within the exemption. First, in 1971, before defendant Grounds began working for plaintiff, he was already interested in entering the O & M manual business. Second, defendant Grounds has admitted that he himself was confused about the meaning of the clause. It would be unfair, therefore, to expect plaintiff to understand its meaning.

is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula or a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers * * *.'" *Elcor Chemical Corp. v. Agri-Sul, Inc.,* 494 S.W.2d 204, 211 (Tex.Civ.App.1973) (quoting Restatement, Torts, § 757).

Certain common elements can be distilled from these definitions and fashioned into a workable test encompassing both concepts. The elements comprising that test are: (1) the protected matter is not generally known or readily ascertainable, (2) it provides a demonstrable competitive advantage, (3) it was gained at expense to the employer, and (4) it is such that the employer intended to keep it confidential.

It is commonly recognized that—

" * * * matters of general knowledge within the industry may not be classified as trade secrets or confidential information entitled to protection." *Whitmyer Bros. v. Doyle,* 58 N.J. 25, 33, 274 A.2d 577, 581 (1971).

The fundamental question here is whether the names of the consulting engineers gleaned by the plaintiff were protected under the employment agreement or were matters of general knowledge that may not be classified as confidential. Defendants argue that the customers' names are not protected because early in 1975, prior to Grounds' receiving his first contract for an O & M manual, Watkins started receiving computer printouts from state and Federal environmental agencies that publish the names of municipalities that have received grants for sewage treatment projects and information regarding the size and type of those projects. Although the printouts only occasionally name the consulting engineer for the project, that information can be obtained from city clerks. Defendants claim that they compiled their list of prospective customers from these printouts.

However, the existence and alleged use of these printouts are not sufficient to establish that the information was "readily ascertainable." There are about 10,000 potential customers (consulting engineers working on projects), and O & M manual preparers must learn the names of these engineers. In late 1974, Grounds had not yet received the printouts and had to rely in part on contacts he had made in the past. Also, even though it may be possible to obtain the names of consulting engineers from city clerks, plaintiff's information provided more detail regarding these prospects. Furthermore, even assuming the presence of an alternate means of obtaining the names of consulting engineers, this, without more, is not sufficient to establish that the information is generally ascertainable.

By inference, there is a reasonable basis to find that a demonstrable competitive advantage could be obtained through use of plaintiff's customer information. As the trial court found—

"The first 20 contracts and a total of 23 of the total of 40 contracts obtained by Grounds or Grounds & Associates, Inc., for O & M Manuals were either with Cherne's customers or prospective Cherne customers. Either Watkins, Grounds or Peterson had contact with the contract purchasers while employed at Cherne. The names of many of these contract purchasers appear in the confidential information taken by Grounds, Watkins and Peterson from Cherne."

There is also the fact that 624 documents were taken from plaintiff's business by the defendants. There would be little purpose in taking such a quantity of documents if defendants did not believe the information was valuable. Plaintiff was the first entrant into the O & M manual business and had compiled a great deal of experience and information. The lists and materials defendants took could only work to enhance their business. Consequently, the information would afford one a demonstrable competitive advantage.

It is clear that the information was gained at expense to the plaintiff. From 1970 to 1974 plaintiff lost $141,224. Part of that cost was attributable to soliciting cus-

tomers, compiling a list, and hiring company representatives.

The evidence suggests that plaintiff sought to keep the information confidential. At various times, plaintiff mailed advertisements about his business; yet, plaintiff never published a list of consulting engineers who purchased the O & M manuals. Plaintiff's manuals were open to public inspection; however, the information as to prospective customers was not available. Therefore, although the names of consulting engineers appeared on the face of the manuals, plaintiff did not reveal his prospective clients. The names of customers for the seven projects involved in this suit were part of the information plaintiff wished to keep confidential.

In *Elcor Chemical Corp. v. Agri-Sul, Inc.,* *supra,* defendants developed in a garage a process for manufacturing fertilizer and did not disclose the discovery to their employer as required by their employment contract. In ruling against the defendants, the court declared:

 " * * * It does not matter that Miller and Kruse could have gained their knowledge from a study of books and magazines. The fact is that they did not do so. Instead, they gained this knowledge from ELCOR by way of their confidential relationship and in so doing they incurred a duty not to use it to ELCOR's detriment. This duty was breached by them and because of this breach, we are compelled by equity to extend to ELCOR adequate injunctive relief." 494 S.W.2d at 213.

Likewise, even if the consulting engineers' names were otherwise available, the defendants' reliance on information gained from their relationship with plaintiff would still make them liable. Watkins admits calling on plaintiff's customers or prospective customers, and using people he knew to make up in part the list of prospects for Grounds.

Defendants also challenge the district court's finding that other information taken by defendants from the plaintiff was confidential. This information included letters, phone reports, and records regarding customers and potential customers; lists and evaluations of Cherne representatives and territories; price lists; production information; and financial information. It appears that the trial court may have been overinclusive in finding that all of this information was confidential. In framing the remedies, however, the court focused on the taking and use of the customer lists. The damages were based on profits gained on contracts with Cherne customers or prospective customers; the injunction restricted rendering services to seven firms that Cherne had previously contacted. Because a finding that the customer lists are confidential was reasonably supported by the evidence, it is not necessary that this court remand for reconsideration of whether the other information is confidential.

3. The injunction.

In the instant case, the trial court granted plaintiff a permanent injunction restraining defendants—

 "[f]rom rendering services directly or indirectly, to any former Cherne customer or organization to which Cherne had submitted a proposal prior to March 8, 1975, * * * during a period ending two years from and after entry of judgment herein."

Defendants argue that the injunction was inappropriate because (1) there was no finding that, absent the injunction, plaintiff would suffer irreparable injury, (2) the information wrongfully taken and used by defendants had lost its confidential character, (3) the 2-year period of restriction in the covenant not to compete had expired, (4) the injunction is a prior restraint on their First Amendment rights of free speech.

■■■■■■ The granting of an injunction generally rests within the sound discretion of the trial court, and its action will not be disturbed on appeal unless, based upon the whole record, it appears that there has been an abuse of such discretion. *AMF Pinspotters, Inc. v. Harkins Bowling, Inc.,* 260 Minn. 499, 504, 110 N.W.2d 348, 351 (1961).

The party seeking the injunction must establish that his legal remedy is not adequate, see, id. at 504, 110 N.W.2d at 351, and that the injunction is necessary to prevent great and irreparable injury. *North Central Public Service Co. v. Village of Circle Pines,* 302 Minn. 53, 60, 224 N.W.2d 741, 746 (1974) (quoting *AMF Pinspotters, Inc. v. Harkins Bowling, Inc.,* 260 Minn. 499, 504, 110 N.W.2d 348, 351 (1961)).

In *Thermorama, Inc. v. Buckwold,* 267 Minn. 551, 125 N.W.2d 844 (1964), we ruled that where the plaintiff alleged that the defendant had breached a covenant not to compete, the plaintiff was entitled to a preliminary injunction restraining the defendant from competitive conduct, finding that, under the circumstances, some irreparable harm could be inferred. Subsequently, we cited the *Thermorama* decision as indicating that "an inherent threat of irreparable injury may be inferred from the breach of an otherwise valid and enforceable restrictive covenant [not to compete or not to disclose trade secrets], sufficient to invoke at least temporary equitable relief." *Eutectic Welding Alloys Corp. v. West,* 281 Minn. 13, 16 n. 4, 160 N.W.2d 566, 569 n. 4 (1968) (dictum).

Because a preliminary injunction is granted prior to a complete trial on the merits, a showing of irreparable harm is required to prevent undue hardship to the party against whom the injunction is issued, whose liability has not yet been determined. If irreparable harm can be inferred from an alleged breach for purposes of a temporary injunction, it can be inferred from a trial court's actual finding of a breach by the defendant. Moreover, where a trial court has determined that the prevailing party is entitled to relief, it may fashion such remedies, legal and equitable, as are necessary to effectuate such relief.

In the present case, the trial court determined that the defendants had breached their employment agreements with Cherne by wrongfully taking and using confidential information. At the posttrial hearing, the trial court, in response to defendants' contention that it had failed to make any finding of irreparable injury, stated that it had adopted plaintiff's proposed finding of fact 120(a) to (d) "in principle." That finding stated that plaintiff "has suffered and will continue to suffer loss and damage." It also outlined some specific types of injury likely to be suffered by plaintiff. The trial court reasonably concluded that an injunction restraining defendants from using that information was necessary to prevent further injury to plaintiff's competitive position.

The trial court's statement that the information wrongfully taken and used by defendants eventually lost the quality of confidentiality may affect the scope of the injunction but does not affect its validity as a remedy for defendants' wrongful conduct. A trial court may issue an injunction against a party who has, in violation of an explicit agreement or a common law duty, wrongfully used confidential information or trade secrets obtained from his employer. See, e. g., *Equipment Advertiser, Inc. v. Harris,* 271 Minn. 451, 136 N.W.2d 302 (1965). Where the information has, subsequent to the wrongful taking and use, become generally available, the initial conduct is still wrongful and the employer is still entitled to relief for any injury suffered as a result of the wrongful use.

In *Winston Research Corp. v. Minnesota Mining and Manufacturing Co.,* 350 F.2d 134 (9 Cir. 1965), the court of appeals upheld the district court's granting of—

"* * * an injunction for the period which it concluded would be sufficient both to deny [the defendant] unjust enrichment and to protect [the plaintiff] from injury from the wrongful disclosure and use of [its] trade secrets by its former employees prior to public disclosure." Id. at 142.

Since trade secrets and confidential information are both subject to the same duty not to disclose, see, Restatement, Agency (2d) § 396, the same rule regarding remedies available when the information has become generally known applies. Since the trial court determined here that defendants

had wrongfully taken and used confidential information of the plaintiff, the district court could, in its discretion, issue an injunction restraining defendants from using and profiting from that information. Although the trial court further determined that the information was no longer confidential, the injunction could be fashioned to ensure that plaintiff was reasonably protected against further injury from the wrongful taking and that defendants were not unjustly enriched by their prior misconduct.[6]

The trial court did not make a specific finding as to when the information lost its confidential character. Absent that specific finding, there are two possible bases for a 2-year injunction. First, if the information is considered to have lost its public quality at the time of trial (May 1977), then the 2-year injunction might be considered reasonable to counteract the defendants' wrongful use of the information in obtaining contracts between April 1975 and May 1977, a period of slightly over 2 years.[7] Second, since development of the confidential information took plaintiff 5 years, defendant would normally have been required to work 5 years from the time it began business in October or November 1974[8] to acquire similar information. If the information became public in May 1977, or earlier, defendants would have had to spend about 2½ years acquiring the information. Thus, the injunction of 2 years would be a reasonable remedy for the defendants'

wrongful use prior to public disclosure of the information. We find that either, or both, of these bases justifies the 2-year injunction.

Defendants argue that if the injunction was intended as a remedy for violation of the covenant not to compete, the issuance of the injunction after the expiration of the 2-year period of restriction in the covenant was improper. Generally, injunctive relief based on a contract must be coextensive with the terms of the contract. See, e. g., *Wagner v. A & B Personnel Systems, Ltd.,* 473 P.2d 179, 180 (Colo.App. 1970). Thus, if the restrictive period of a covenant not to compete has expired, an injunction will not be granted to enforce the covenant. See, e. g., *Hayes v. Altman,* 438 Pa. 451, 455, 266 A.2d 269, 271 (1970); *Elcor Chemical Corp. v. Agri-Sul, Inc.,* 494 S.W.2d 204, 213. Nevertheless, there may be situations where injunctive relief extending beyond the expiration of the period established by the covenant is appropriate. See, *American Eutectic Welding Alloys Sales Co. v. Rodriguez,* 480 F.2d 223 (1 Cir. 1973); *Premier Industrial Corp. v. Texas Industrial Fastener Co.,* 450 F.2d 444 (5 Cir. 1971). Since we have determined that the injunction in this case could be issued as a remedy for a breach of the duty not to use confidential information, we need not decide whether this injunction could be issued as a remedy for the breach of the covenant not to compete.

6. A trial court has authority to draft an injunction so that it provides an adequate remedy without imposing unnecessary hardship on the enjoined party. Here defendants argue that the injunction against rendering services to seven named firms is not clearly tailored to remedy any injury sustained as a result of the wrongful use of confidential information. Because the trial court found that defendants had wrongfully taken customer lists, it might reasonably have found that, apart from the covenant not to compete, defendants had wrongfully used this information to solicit business from the seven firms named in the injunction and, in order to provide an adequate remedy to plaintiff and to prevent defendants from profiting unjustly from their misconduct, an injunction against seeking new business with those firms for 2 years was necessary.

7. The trial court's limitation of the injunction to seven firms contacted by Cherne prior to March 8, 1975 (the day after Peterson left), and its limitation in the calculation of damages to contracts entered by defendants between April 1, 1975, and May 23, 1977, implies that the court determined that defendants had only been in business for approximately 2 years, from March 1975 to May 1977. Thus, the 2-year injunction would correspond to the 2 years of misconduct.

8. Watkins resigned from Cherne in October 1974 and entered into an employment agreement with Grounds in November 1974. It appears the trial court could reasonably conclude that Grounds' entry into the O & M manual business began at that time.

Finally, defendants argue that the injunction prohibiting them from rendering services to potential customers is an unlawful restraint on expression and violates their First Amendment rights.[9] The First and Fourteenth Amendments guarantee against abridgment of speech and expression by state governments; they do not provide protection or redress against abridgment by private individuals or corporations. *Hudgens v. NLRB*, 424 U.S. 507, 513, 96 S.Ct. 1029, 1033, 47 L.Ed.2d 196, 202 (1976); *Lloyd Corp. v. Tanner*, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972).[10]

The injunction here is based upon a contract between private parties. The purpose of the contract was to protect plaintiff's legitimate business interest in the information it had developed for the preparation and marketing of the O & M manuals. Defendants had both contractual and common law duties not to disclose this information and not to use it to harm plaintiff's business. The protection to which plaintiff was entitled is similar to that provided to the holder of a copyright. Both are protected from the unauthorized use of their ideas, ideas that, in many cases, they have spent significant time, skill, and money in developing. Conduct that infringes upon a copyright has been found not to be entitled to First Amendment protection. *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1171 (9 Cir. 1977). By analogy, a former employee's use of confidential information or trade secrets of his employer in violation of a contractual or fiduciary duty is not protected by the First Amendment. Given the public interest in preserving the ability of parties freely to enter contracts and to seek judicial enforcement of such contracts and in providing judicial remedies for breaches of fiduciary duties imposed by law, any infringement by the injunction on defendants' First Amendment rights is tolerable and justified.[11]

4. Compensatory damages.

Defendants argue that the trial court's use of defendants' profits, rather than plaintiff's loss, as the measure of damages was improper.[12] Although damages for breach of contract are traditionally measured by the nonbreaching party's loss of expected benefits under the contract, see, Dobbs, Remedies § 12.1, where an employee wrongfully profits from the use of information obtained from his employer, the measure of damages may be the employee's gain, see, id. § 10.5, at 693. Also, this court has specifically found that the

9. The injunction does not fit within the traditional definition of prior restraint. "Prior restraint" usually refers to judicial suppression, prior to publication, of expression alleged to be "dangerous" or "defamatory." See, e. g., *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). In this case, the defendants have already published; a court, after a full trial on the merits, has determined that defendants wrongfully used confidential information belonging to plaintiff in preparing and marketing those publications and that plaintiff has thereby been injured. Enjoining further publication, therefore, does not operate as an unlawful prior restraint.

10. The United States Supreme Court has found that court enforcement of a private agreement is state action within the meaning of the Fourteenth Amendment. *Shelley v. Kraemer*, 334 U.S. 1, 14, 68 S.Ct. 836, 842, 92 L.Ed. 1161, 1181 (1948). But the court's holdings in *Hudgens v. NLRB*, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976), and *Lloyd Corp. v. Tanner*, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972), imply that not every judicial enforcement of a private agreement or regulation that may interfere with free expression will be considered an unconstitutional abridgment of First Amendment rights. In both of these latter cases, there were only threats to arrest the picketers and demonstrators. Nevertheless, the court, by finding that the shopping centers could exclude the picketers and demonstrators, implied that actual enforcement through an injunction or criminal prosecution would have been upheld.

11. By its terms, the injunction only restricts defendants from dealing with seven firms. Thus, they have not been totally deprived of their First Amendment rights or of an opportunity to prepare O & M manuals.

12. Plaintiff was awarded $39,322.50 in compensatory damages. This figure represents 10 percent of defendants' revenue from contracts with former or prospective customers of Cherne.

violator of a covenant not to compete may be required to account for his profits, and such illegal profits may properly measure the damages. *Peterson v. Johnson Nut Co.*, 209 Minn. 470, 477, 297 N.W. 178, 182 (1941); cf. *National School Studios, Inc. v. Superior School Photo Service, Inc.*, 40 Wash.2d 263, 242 P.2d 756 (1952) (not using defendants' profit where methods of doing business were dissimilar).

■ Defendants contend that the trial court did not clarify whether the damage award was based upon breach of the employment agreement or use of the confidential information. In general, a plaintiff who successfully establishes that the defendant has breached an employment contract or has wrongfully taken and used trade secrets or confidential information may obtain both injunctive relief and damages. See, e. g., *Orkin Exterminating Co. (Arwell Division) v. Burnett*, 160 N.W.2d 427 (Iowa 1968); *Peterson v. Johnson Nut Co., supra*, 209 Minn. 478, 297 N.W. 182; *Elcor Chemical Corp. v. Agri-Sul, Inc., supra; Vermont Electric Supply Co. v. Andrus*, 132 Vt. 195, 315 A.2d 456 (1974). Whether a plaintiff receives either or both remedies depends upon what is necessary to recompense him for past injury and to prevent future injury.

■ Since the trial court reasonably concluded that the defendants breached both their covenant not to compete and their obligation not to use confidential information, the awarding of damages in addition to the injunction was within the trial court's discretion and appropriate to compensate the plaintiff for past injury.

■ Defendants also argue that the trial court erred by finding that a reasonable profit figure for Grounds was 10 percent. Although 10 percent may be a reasonable profit figure, the trial court could have attempted to determine defendants' actual profits. The method used, however, is not clearly erroneous. Also, because the amount is reasonable given defendants' enormous gross revenues resulting from use of plaintiff's material and plaintiff's losses

of over $141,000 in start-up costs during the first 5 years of business, this court will not reverse the trial court's award.

5. Punitive damages.

Defendants argue that the award of punitive damages was in error. In so arguing, they assume that the punitive damages were assessed because of their assertion of counterclaims that the district court dismissed as sham and frivolous. This assumption is based on the following statement in the memorandum accompanying the trial court's order of June 10, 1977:

"Punitive damages have been awarded only against defendants Grounds and the defendant corporation. The legal basis for their award has been shown by a variety of his actions. I am satisfied he orchestrated the actions of Watkins and Peterson and indeed has been the impresario throughout all of this bitter transaction. This litigation was itself escalated to unnecessary heights by his actions which were both malicious and reckless."

The wording of this paragraph does not necessarily imply that the punitive damages were assessed because of the counterclaims. A more reasonable reading is that the court considered the counterclaims as one instance of conduct by Grounds that justified punitive damages.

■ The general rule is that punitive damages are not recoverable in actions for breach of contract. See, *Johnson v. Radde*, 293 Minn. 409, 410, 196 N.W.2d 478, 480 (1972). Such damages may be recovered, however, where the breach has resulted from an independent or willful tort and the defendant has acted with malice. This court has defined the "malice" necessary for the imposition of punitive damages as the intentional doing of a harmful act without legal justification. 293 Minn. 410, 196 N.W.2d 480.

■ In order to determine whether punitive damages were properly assessed against Grounds and Grounds and Associates, Inc., we must determine whether there was sufficient evidence for the trial court to find that these defendants acted with mal-

96

ice. The conclusions of law on which the court apparently based its assessment of punitive damages are the following:

"8. The Defendant Grounds tortiously interfered with Cherne's employment contracts with Watkins and Peterson by hiring them, knowing they. had signed such agreements and that the noncompete provisions of the agreement were applicable at the time of hir'ug, and by availing himself of the confidential information taken by Watkins and Peterson, knowing that the employment agreements prohibited the taking and use of such information.

"9. The Defendant, Grounds & Associates, Inc., tortiously interfered with Grounds', Watkins', and Peterson's employment contracts with Cherne by hiring them, knowing that the noncompete provisions of their employment contracts had not expired, and by condoning and accepting the use of confidential information taken from Cherne, knowing that such taking and use was prohibited under the employment agreements."

These conclusions are supported by the following facts:

(1) Grounds witnessed the signing of the employment agreements by Watkins and Peterson (it is reasonable to assume that he knew the provisions of those contracts);

(2) Grounds hired both Watkins and Peterson within 2 years after the termination of their employment at Cherne;

(3) Grounds, Watkins, and Peterson wrongfully took confidential information from Cherne;

(4) Grounds used the information taken by Watkins and Peterson;

(5) Grounds & Associates was a sole proprietorship owned by Grounds, which was incorporated in December 1975, assuming the assets and liabilities of the proprietorship;

(6) prior to going to work for Cherne, Grounds wanted to go into his own business, including the O & M manual business.

These findings of fact are not clearly erroneous. Grounds, knowing the obligations of Watkins and Peterson to Cherne under the employment agreement, encouraged them to breach that contract by coming to work for him in a business that competed with Cherne's O & M manual business and by bringing with them confidential information that would help Grounds to develop his new business. The trial court reasonably inferred that Watkins and Peterson would not have taken information from Cherne except to help Grounds. Such conduct by Grounds was the "intentional doing of a harmful act"; thus Grounds acted with the malice requisite to imposition of punitive damages. That malice can be imputed to the business he operated as a sole proprietorship, and liability for that malicious conduct may be imposed upon the corporation, which assumed the assets and liabilities of the sole proprietorship. Cf. *Geiger v. Sanitary Farm Dairies*, 146 Minn. 235, 238, 178 N.W. 501, 503 (1920) (new corporation assumes all liabilities of old corporation, including tort liabilities). In addition, to the extent that Grounds acted as an agent of the corporation, the corporation is liable. See, *Eastman v. Leiser Co.*, 148 Minn. 96, 100, 181 N.W. 109, 111 (1921) (corporation liable for agents' malicious prosecution).

6. Attorneys fees.

■ Generally attorneys fees may not be awarded to a successful litigant absent specific contractual or statutory authority. See, *Fownes v. Hubbard Broadcasting, Inc.*, 310 Minn. 540, 542, 246 N.W.2d 700, 702 (1976); *State, by Spannaus v. Carter*, 300 Minn. 495, 497, 221 N.W.2d 106, 107 (1974); *Benson Cooperative Creamery Association v. First District Association*, 276 Minn. 520, 530, 151 N.W.2d 422, 428 (1967). Since there is no such authorization here, plaintiff attempts to base its claim for attorneys fees upon an exception, recognized but not applied by this court in *Fownes v. Hubbard Broadcasting, Inc., supra*, allowing recovery of attorneys fees "where the unsuccessful party has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'" 310 Minn. 542, 246 N.W.2d 702 (quoting 6

The trial court is therefore affirmed.

---

13. This exception has now been enacted into law. L.1978, c. 738, § 5 (codified at Minn.St. 549.21).