941 F.2d 1361
 OVERHOLT CROP INSURANCE SERVICE COMPANY, Appellee,
v.
Richard TRAVIS, John Salzsiedler, James Nielsen, Appellants.
IGF Insurance Company.
OVERHOLT CROP INSURANCE SERVICE COMPANY, Appellee,
v.
Richard TRAVIS, John Salzsiedler, James Nielsen,
IGF Insurance Company, Appellant.
 Nos. 90-5453, 90-5454.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 14, 1991.
Decided Aug. 14, 1991.
Rehearing Denied Sept. 9, 1991.
 
 William Srstka, Jr., Pierre, S.D., and John Templer, Jr. of West Des Moines, Iowa, argued, for appellants; Daniel Graves, Pierre, S.D., on the brief.
 John Krenn, Minneapolis, Minn., argued, for appellee; Timothy Burke, Minneapolis, Minn., and Robert Anderson, Pierre, S.D., on the brief.
 Before MAGILL and BEAM, Circuit Judges and HEANEY, Senior Circuit Judge.
 HEANEY, Senior Circuit Judge.
 
 
 1
 Overholt Crop Insurance Company (Overholt) brought this diversity action against Richard Travis, John Salzsiedler, James Nielsen, and IGF Insurance Company (IGF) for wrongfully taking from Overholt and delivering to IGF a substantial portion of Overholt's South Dakota crop insurance business. A jury found for Overholt and awarded damages in excess of one million dollars. The defendants appeal, and we affirm.
 
 FACTS
 
 2
 Overholt is a general insurance agency which sells crop insurance policies to farmers. It serves as the general agency for Home Farmers Mutual Insurance and sells that companies' policies through insurance agents called "special representatives." Representing Overholt within an assigned territory, Overholt's special representatives are full-time employees with all the attendant benefits.
 
 
 3
 Richard Travis, Overholt's special representative to several hundred Overholt policyholders in north-central South Dakota, began negotiating a retirement compensation plan with Overholt in 1986. John Salzsiedler, a friend of Travis and a seasonal adjuster for Overholt, was aware that Travis was contemplating retirement. Beginning in January 1989, Salzsiedler and Travis discussed the possibility of Salzsiedler replacing Travis and assuming Travis' territorial assignment as an Overholt special representative. Apparently, this plan was rejected, and instead, Travis and Salzsiedler eventually agreed in September 1989 that Salzsiedler would become an agent for IGF and use Travis' knowledge of Overholt's client base to increase Salzsiedler's sales for IGF. To compensate Travis for his cooperation in facilitating Salzsiedler's sales, Travis and Salzsiedler devised a commission-sharing plan.
 
 
 4
 Travis' contract with Overholt contained a restrictive covenant. The covenant included a nonsolicitation agreement, which prevented Travis from attempting to persuade Overholt's clients to switch insurers. The covenant also included a nondisclosure clause, which prevented Travis from exploiting Overholt's confidential information after he left Overholt. The restrictive covenant bound Travis for two years following the end of his employment with Overholt.
 
 
 5
 During the period in which Salzsiedler and Travis were crafting their agreement, James Nielsen attempted to recruit Salzsiedler as an independent agent for IGF. Before joining IGF in a managerial capacity, Nielsen had sold crop insurance for Overholt from 1982 until 1988. Like Travis, Nielsen had entered into a restrictive covenant with Overholt as a condition of his employment. Salzsiedler notified Travis of this recruitment, and Nielsen discussed with Travis the possibility of Salzsiedler becoming an IGF agent.
 
 
 6
 In the spring of 1989, Salzsiedler decided to join IGF as a crop insurance agent. Accordingly, Nielsen arranged for IGF to provide Salzsiedler with a $4,000 per month draw against his future commissions. Salzsiedler began receiving this draw in June 1989, although he did not officially commit to IGF until August 1989.
 
 
 7
 During the summer of 1989, Salzsiedler and Travis adjusted claims for Overholt. While adjusting, they would tell the claimants, most of whom had grown accustomed to Travis being their Overholt representative, that Travis was retiring at the end of the year, that Salzsiedler was going to become an independent insurance agent, and that Travis would be acting as a consultant to Salzsiedler. They never mentioned IGF to these customers even though Travis knew that Salzsiedler was receiving a draw from IGF. Similarly, although Travis knew about Salzsiedler's relationship with IGF, he did not mention it to Overholt.
 
 
 8
 During July and August of 1989, Travis helped Salzsiedler compile a list of prospective customers and drafted a letter of introduction promoting Salzsiedler to these prospective customers. In his letter of introduction, Travis stated his intent to "continue to be active in crop insurance acting as a consultant to John." Travis and Salzsiedler worked together to address and mail these letters. Many of the prospective customers were insured by Overholt. When Salzsiedler began making sales for IGF, Travis assisted Salzsiedler in processing the crop insurance applications and used Overholt's files to obtain information necessary to transfer insurance carriers from Overholt to IGF. Overholt continued to employ Travis during this period.
 
 
 9
 On August 10, 1989, Overholt learned that Travis was promoting Salzsiedler and consequently reassigned most of Travis' territory to other Overholt agents. One of the agents Overholt assigned to Travis' former territory resigned from Overholt on August 17, 1989, and joined IGF four days later. This defection left Overholt with no representative other than Travis in most of Travis' former territory.
 
 
 10
 Travis finally notified Overholt in mid-September that he planned to resign effective the end of the crop year. From August 1 to September 15, 1989, Travis did not write a single application for crop insurance on behalf of Overholt. Salzsiedler, on the other hand, made 223 sales. All but three of the 223 IGF insurance policies were sold to Overholt customers who had formerly been serviced by Travis. During the same period the year before, Travis had written at least seventeen applications for Overholt. Additionally, although Travis knew that Salzsiedler was successfully soliciting Overholt customers during this six-week period, he did not notify Overholt that it was losing customers to IGF, despite the fact that Overholt had no representative other than Travis in the counties where Salzsiedler operated.
 
 
 11
 In mid-September, Travis and Salzsiedler orally agreed to their commission-sharing plan. Salzsiedler agreed to share his commissions on non-Overholt customers immediately and to begin sharing his commissions on Overholt customers after the expiration of Travis' two-year restrictive covenant. As early as July 1989, Salzsiedler had informed a colleague of the contours of what became the commission-sharing plan between Salzsiedler and Travis and stated to this colleague that he considered the arrangement to be a "done deal."
 
 
 12
 Around the time that he agreed to this commission-sharing plan, Salzsiedler told Nielsen that they were discussing such an arrangement. Until this time, IGF contends that neither Nielsen nor IGF knew of this plan or of Travis' activities promoting Salzsiedler. Nielsen's telephone records indicate, however, that he had at least two conversations totaling forty-nine minutes with Travis immediately before the date on which IGF offered Salzsiedler a $4,000 draw. Both Nielsen and Travis claim to have forgotten the subject of these calls. After Travis left Overholt in mid-September 1989, he signed an independent agent contract with IGF. In October 1989, Nielsen received a $1,000 per month raise in his draw.
 
 
 13
 Overholt claims that the damage caused by Travis' scheme was devastating. In the fall of 1989, Overholt's total policy cancellation rate was roughly ten percent. In Travis' territory, however, the cancellation rate was about eighty percent on multiperil crop insurance policies and forty-five percent on crop hail policies. During previous years, the cancellation rate in Travis' territory was approximately five percent. Overholt claims it will continue to suffer from the effects of this dramatic surge in the cancellation rate, because crop insurance policies renew automatically every year unless canceled and because the renewal rate of policies is extremely high.
 
 
 14
 On October 20, 1989, Overholt filed an action against Travis, Salzsiedler, Nielsen, and IGF. A jury found each of the defendants jointly and severally liable to Overholt, awarding damages in excess of one million dollars.[1] The district court enjoined each of the defendants from future wrongful interference with Overholt's business and also ordered defendants to compensate Overholt for its attorneys' fees.
 
 DISCUSSION
 
 15
 I. Issues Raised by Travis, Salzsiedler, and Nielsen
 
 RESTRICTIVE COVENANTS
 
 16
 We initially consider whether the restrictive covenants that Overholt entered into with Travis and Nielsen were valid under state law. In a diversity case, the district court "follow[s] the choice of law rules of the state in which it sits." United States Fidelity & Guar. Co. v. Louis A. Roser Co., 585 F.2d 932, 935 n. 2 (8th Cir.1978).
 
 
 17
 The contracts, which are identical, provide: "Any and all matters of dispute of any nature whatsoever arising out of, or in any way connected with this agreement or the relationship between the parties hereto" shall be determined in accordance with Minnesota law. The Supreme Court of South Dakota generally honors contractual choice-of-law stipulations. See Baldwin v. Heinold Commodities, Inc., 363 N.W.2d 191, 195 (S.D.1985). Public policy concerns, however, limit this general acceptance. "[F]oreign laws will not be given effect if, by doing so, contract provisions would be enforced which would be contrary to the settled public policy of [South Dakota]." State ex. rel. Meierhenry v. Spiegel, Inc., 277 N.W.2d 298, 300 (S.D.1979).
 
 
 18
 Travis and Nielsen claim that an overriding South Dakota public policy controls the choice-of-law analysis in this case, and thus South Dakota, and not Minnesota, law should govern our analysis of the restrictive covenants. They argue that the covenants violate South Dakota public policy and therefore should not be given legal effect. We disagree.
 
 The covenants, in pertinent part, read:
 
 19
 7. Any and all insurance business procured by or allocated to the Employee while in the employ of the Company, and the expiration and renewal rights thereto, shall be the permanent and exclusive property of the Company and shall be for the Company's exclusive benefit. In this connection the Company shall have the exclusive right, title and interest in and to all materials, service, and information pertaining to such business, whether in the possession of the Employee or the Company, including but not by way of limitation, all records of insurance policies, manuals, communications, sales and promotion materials, telephone listings, secretarial and telephone services, policy expiration dates, and the names, telephone numbers and addresses of existing or prospective policyholders. On the termination of the Employee's employment, all such materials, services and information shall be immediately surrendered to the Company, whether provided by the Company or prepared by the Employee, and will not thereafter be used by the Employee.
 
 
 20
 8. During the Employee's employment and for a period of two years following the date of termination of employment with the Company, the Employee will not engage directly or indirectly, personally or through any other person in any of the following activities:
 
 
 21
 (a) The Employee will not in any way attempt to solicit or otherwise effect the discontinuance of any of the Company's insurance business, or attempt to effect a renewal or replacement of any part thereof by any other insurer within the territory assigned by or worked for the Company within two years prior to the date of termination of employment, whether employed as a Special Representative or in any other capacity with the Company;
 
 
 22
 (b) The Employee will not, on Employee's own behalf or for any other insurer, agent, broker or salesman, accept or effect the placement of any renewal or replacement in whole or in part of any insurance being provided by the Company:
 
 
 23
 (1) within the territory assigned hereunder;
 
 
 24
 (2) within any other territory assigned by or worked for the company within two years prior to the date of termination of employment, whether employed as a Special Representative or in any other capacity with the Company;
 
 
 25
 (c) The Employee will not divulge to any person any of the information described in Section 7 above with respect to the Company's existing or prospective policy holders;
 
 
 26
 (d) The Employee will not solicit or seek to influence any other employee of the Company to become directly or indirectly the employee or representative of any other insurance company.
 
 
 27
 Travis and Nielsen claim that these terms violate both the statutory and case law of South Dakota.
 
 
 28
 The South Dakota legislature has approved covenants not to compete:
 
 
 29
 An employee may agree with an employer at the time of employment or any time during such employment not to engage directly or indirectly in the same business or profession as that of his employer for any period not exceeding ten years from date of such agreement and in any specified territory not exceeding a radius of twenty-five miles from the principal place of business of the employer, as specified in such agreement, but such contracts between employee and employer shall apply only to those engaged in some profession, the practitioners of which must be duly licensed in the State of South Dakota.
 
 
 30
 S.D. Codified Laws Ann. § 53-9-11 (1989). The leading case interpreting this statute is 1st American Systems, Inc. v. Rezatto, 311 N.W.2d 51 (S.D.1981). In Rezatto, the Supreme Court of South Dakota ruled that insurance salesmen are not professionals for purposes of section 53-9-11. As such, they cannot be bound by noncompetition clauses. Id. at 55. Appellants argue that this ruling controls here.
 
 
 31
 The contract before us, however, does not contain a noncompetition clause, since the restrictive covenants do not prevent Travis and Nielsen from competing with Overholt. Instead, the contracts prevent them from soliciting Overholt's customers or exploiting the confidential customer information outlined in Paragraph 7 of the contract. Rezatto categorized such provisions as nondisclosure clauses,[2] and upheld the validity of such conditions as long as actual trade secrets were being protected and as long as the terms of the nondisclosure clause were reasonable. Id. at 56-59.
 
 
 32
 Nondisclosure clauses "are strictly construed and enforced only to the extent reasonably necessary to protect the employer's interest in confidential information." Id. at 57 (citations omitted). In Rezatto, pursuant to this rule of construction, the Supreme Court of South Dakota held "that the expiration and renewal dates, personal customer data and customer names and addresses within appellant's files taken together and construed in light of the contract's express creation of confidentiality comprise a trade secret even though separately each item may not rise to that level." Id. at 59.
 
 
 33
 Here, Travis clearly exploited his confidential knowledge of Overholt's customer pool. He examined Overholt's files to gain information which would facilitate Salzsiedler's sale of IGF policies to former Overholt customers. IGF's vice president for sales admitted that customer information is confidential and that having the customer list of an agent would place another agent at a competitive advantage. Appellants contend, however, that these factors alone do not satisfy the standard for trade secrets established in Rezatto. See id. at 57.
 
 
 34
 Appellants' reading of Rezatto, however, unduly minimizes Rezatto's emphasis on the existence of a restrictive covenant. Indeed, the presence of a covenant grows in importance when it is coupled with confidential information. As the Supreme Court of South Dakota explained:
 
 
 35
 Even if the contract protects information which is technically not a trade secret, it clearly reveals the intent of the parties to create a confidential relationship. A breach of this relationship is actionable even if Rezatto could glean some of the information from public sources.
 
 
 36
 Id. at 58 (citations omitted). This case involves a similar synergistic relationship. Travis appears to have been fully cognizant of Overholt's intention to create a confidential relationship. The terms of his employment contract clearly announce this intent. Indeed, if Travis were not aware of such an intent, his scheme to breach the contract probably would not have been so elaborate and would not have required the assistance of Salzsiedler. Even an IGF executive admitted that restrictive covenants for sales personnel like Travis make sense. Our decision in this case is controlled by Rezatto's holding that information which might not otherwise qualify as trade secrets is elevated to this status when construed in light of the contract's creation of a confidential relationship. Id. at 59.
 
 
 37
 We next examine the reasonableness of the nondisclosure and nonsolicitation clauses that comprise the restrictive covenant. In Rezatto, the Supreme Court of South Dakota noted with approval restrictive covenants with durations of two and three years. Id. Here, the covenants run for two years. In Rezatto, covenants against accepting the former employer's customers and against soliciting the former employer's prospective customers were deemed overbroad. Id. Implicitly, however, South Dakota's Supreme Court approved of covenants restricting an employee from canvassing or soliciting business from the former employer's customer list. See id. This was the effect of the restrictive covenants on Travis and Nielsen. Accordingly, we find the nondisclosure and nonsolicitation clauses of the employment contracts at issue here to be legally enforceable under South Dakota law.
 
 
 38
 Because the contracts do not violate the public policy of South Dakota, they will be reviewed under Minnesota law, as expressly required by the contracts. Travis and Nielsen do not argue that their contracts are invalid under Minnesota law, but focus instead on the nuances of South Dakota law discussed above. This emphasis is understandable. The Minnesota Court of Appeals has upheld the reasonableness of an identical Overholt contract. Overholt Crop Ins. Serv. Co. v. Bredeson, 437 N.W.2d 698, 702-04 (Minn.Ct.App.1989); see also Cherne Indus., Inc. v. Grounds & Assocs. 278 N.W.2d 81, 88-91 (Minn.1979) (restrictive covenants enforced to the extent they are reasonable). We thus affirm the district court's finding that the nonsolicitation and nondisclosure clauses of the contracts were enforceable.
 
 
 39
 Travis and Nielsen also contend that the restrictive covenants should be void for lack of consideration. Although both individuals accepted the restrictive covenants after they had already begun working for Overholt, neither of them received consideration for their acceptance of the covenants. Case law indicates that Minnesota requires independent consideration when a restrictive covenant is entered into after an individual has begun working for an employer. See, e.g., Modern Controls, Inc. v. Andreadakis, 578 F.2d 1264, 1267 (8th Cir.1978).
 
 
 40
 We need not reach the merits of this argument, however. Nielsen and Travis waived this affirmative defense by failing to raise it in their answer, see Fed.R.Civ.P. 8(c), and by failing to identify any relevant exceptions to this general rule, see Wright & Miller, 5 Federal Practice and Procedure 491-502 (2d ed. 1990).JURY INSTRUCTIONS
 
 
 41
 Travis, Salzsiedler, and Nielsen next argue that the district court erred in refusing to submit to the jury four specific instructions. We conclude that, taken as a whole, the jury instructions given by the district court fairly and accurately presented the applicable law. See Grogan v. Garner, 806 F.2d 829, 836 (8th Cir.1986), rev'd on other grounds, --- U.S. ----, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).
 
 
 42
 Appellants first contend that the jury should have been instructed that "protection of an employer's proprietary interest in customer lists is limited to written lists since an employer does not possess a property right in the mental processes of an employee." Appellants suggested two jury instructions to this effect. To support their argument, appellants cite 1st American Systems, Inc. v. Rezatto, 311 N.W.2d 51 (S.D.1981). In Rezatto, the Supreme Court of South Dakota considered it significant that the defendant in that case "relied on the entire file, not merely a customer list or the expiration dates." Id. at 58. Here, we have a similar situation. Travis admitted that he went into Overholt's files to assist Salzsiedler in transferring customers from Overholt to IGF. Therefore, Travis relied on more than his mental processes alone to aid Salzsiedler. Accordingly, the facts of this case did not warrant the jury instruction suggested by appellants.
 
 
 43
 Appellants next argue that the jury should have been instructed that to find the presence of trade secrets in this case (e.g., customer lists and expiration dates), Overholt must have reasonably tried to maintain the secrecy of the alleged trade secrets. See S.D. Codified Laws Ann. § 37-29-1(4)(ii) (1990). We find that the jury received such instruction. Instruction No. 23 read in pertinent part: "A trade secret ... is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."
 
 
 44
 Appellants finally claim the jury should have been instructed that to find that the defendants tortiously interfered with Overholt's contracts, the jury must first conclude that "the Defendants induced the Plaintiff's policyholders to breach their contracts with the Plaintiff." The instruction issued by the district court stated that a party is liable for "inducing or otherwise causing the third person not to perform the contract...." This language was lifted from the Restatement (Second) of Torts § 766, and closely parallels the words of the instruction requested by the appellants. We find this language to fairly and accurately present the applicable principles of law.
 
 LIQUIDATED DAMAGES
 
 45
 Travis and Nielsen also argue that the liquidated damages provisions in their Special Representative's Employment Contracts are unenforceable under both South Dakota and Minnesota law and that therefore, the district court erred in submitting liquidated damages instructions to the jury. We disagree.
 
 
 46
 South Dakota Codified Laws Annotated § 53-9-5 provides:
 
 
 47
 Every contract in which amount of damage or compensation for breach of an obligation is determined in anticipation thereof is void to that extent except the parties may agree therein upon an amount presumed to be the damage for breach in cases where it would be impracticable or extremely difficult to fix actual damage.
 
 
 48
 When implementing this law, the Supreme Court of South Dakota instructed:
 
 
 49
 Ordinarily a provision for payment of a stipulated sum for liquidated damages will be sustained if (1) at the time the contract was made the damages in the event of breach were incapable or very difficult of accurate estimation, (2) there was a reasonable endeavor by the parties to fix fair compensation, and (3) the amount stipulated bears a reasonable relation to probable damages and is not disproportionate to any damages reasonably to be anticipated.
 
 
 50
 Prentice v. Classen, 355 N.W.2d 352, 355 (S.D.1984) (citation omitted).
 
 
 51
 The relevant contractual clauses here provide for liquidated damages totaling twice the annual Overholt premiums lost as a result of Travis' contractual violation.[3] In our opinion, such provisions reasonably estimate what are difficultly calculated future damages. Similarly, we do not consider this formula to be penal in nature. With a historic renewal rate of approximately ninety percent, the loss of one customer potentially has a recurring impact, particularly when the loss of referrals is also considered. Accordingly, we find the liquidated damages formula to be a reasonable means for determining damages, and thus in accordance with the law of South Dakota.
 
 
 52
 Because the liquidated damages provisions satisfy South Dakota law, we now examine them under Minnesota law. See Part I, supra. Minnesota law in this area parallels that of South Dakota. See Gorco Constr. Co. v. Stein, 256 Minn. 476, 99 N.W.2d 69, 74-76 (1959). Accordingly, we find the liquidated damages provisions acceptable under Minnesota law and hold that the district court did not err in submitting to the jury an instruction which allowed the jury to award liquidated damages.
 
 ATTORNEYS' FEES
 
 53
 Appellants next challenge the award of attorneys' fees in this case. The employment contracts stipulated:
 
 
 54
 In the event of a breach by the employee of any of the covenants herein, the Company shall be entitled to recover all loss or damage thereby incurred, including, but not by way of limitations, costs of litigation and reasonable attorneys' fees.
 
 
 55
 Appellants argue that these provisions violate South Dakota Codified Laws Annotated § 15-17-10 (1990).[4] We disagree. This statute refers only to "notes, bonds, mortgages, or other evidence of debt" and does not mention employment contracts. See Assman v. J.I. Case Credit Corp., 411 N.W.2d 668, 671 (S.D.1987). Moreover, appellants have not directed our attention toward any case law which holds that this statute applies to the situation before us.
 
 
 56
 Citing South Dakota Codified Laws Annotated § 15-17-7[5] (1990), and Ofstead v. South Dakota Department of Transportation, 387 N.W.2d 539 (S.D.1986), appellants further contend that recovering attorneys' fees requires specific statutory authorization. Appellants' argument, however, ignores Assman v. J.I. Case Credit Corp., 411 N.W.2d 668 (S.D.1987), which recognized that "parties may generally contract for payment of attorney's fees." Id. at 671 (citations omitted). In Assman, the Supreme Court of South Dakota ruled that an agreement which stipulated the award of attorneys' fees was enforceable. Id. Accordingly, we affirm the award of attorneys' fees against the defendants.[6]
 
 PERMANENT INJUNCTION
 
 57
 Appellants next contend that the permanent injunction issued by the district court is overly broad and unnecessary as a matter of law. After the jury verdict, the district court enjoined Travis from continuing to violate the restrictive covenant, while similarly enjoining Salzsiedler, Nielsen, and IGF from exploiting their relationship with Travis in order to promote sales to Overholt customers. Appellants claim that restraining them from contacting or communicating with past, present, or prospective policyholders of Overholt precludes them from doing business in South Dakota. To support their claim, appellants quote the permanent injunction as applying to "prospective policy holders" of Overholt. Prohibiting contact with any prospective policyholders of Overholt would stifle any expansion of IGF's client base. If this were the effect of the injunction, we might agree that it is overbroad. The quoted language, however, does not appear in the injunction order. Instead, the injunction expressly limits itself to past and present Overholt customers.
 
 
 58
 Minnesota law[7] stipulates that "the granting of an injunction generally rests within the sound discretion of the trial court, and its action will not be disturbed unless, based upon the whole record, it appears that there has been an abuse of discretion." Cherne Indus., Inc. v. Grounds & Assocs., 278 N.W.2d 81, 91 (Minn.1979) (citations omitted). To persuade the court to impose an injunction, "the party seeking the injunction must establish that his legal remedy is not adequate and that the injunction is necessary to prevent great and irreparable injury." Id. at 92 (citations omitted).
 
 
 59
 Here, Overholt cannot be protected by legal remedies alone. Estimating Overholt's future losses if appellants are able to continue their practices is practically impossible, and given Travis' and Salzsiedler's past practices, the potential for them to continue to prey upon Overholt is real. Appellants argue, however, that Overholt has already been monetarily compensated for future damages and therefore an injunction is not necessary. We do not agree. When Overholt's customers defected to IGF, Overholt not only lost that year's premiums but also lost the future renewal premiums of these same customers. The monetary award for future losses compensates Overholt for the customers and the future renewal premiums that Overholt had already lost. Conversely, the permanent injunction protects Overholt against the loss of any additional customers due to the illegalities of the defendants. Without an injunction, Overholt's clientele might be further eroded as a result of the defendants' predatory habits. Because of the distinction between compensating Overholt for customers it has already lost and protecting Overholt from the loss of additional customers, the appellants' argument fails.
 
 
 60
 Irreparable harm "can be inferred from a trial court's actual finding of a breach [of a restrictive covenant] by the defendant." Id. The trial court made such a finding and the record supports its conclusion. In light of these considerations, the trial court did not abuse its discretion by ordering a permanent injunction.
 
 
 61
 Appellants finally argue that if it is to be effective at all, the permanent injunction should not last beyond the two-year period stipulated in Travis' restrictive covenant. Travis officially left Overholt on September 15, 1989; therefore, the restrictive covenant bound him until September 15, 1991. The trial court, however, decided that the permanent injunction should begin from the date of the jury verdict on May 4, 1990. The restrictive covenant ran for two years to give Overholt the opportunity to hire and train a sales representative for Travis' former territory and to give the new representative time to develop relationships with Overholt's customers. Because of the activities of Travis and the resultant litigation, however, this transition did not occur as anticipated. Indeed, only after the court enjoined Travis could Overholt resume business as usual and begin the transition necessary to establish a new representative in Travis' former territory. For these reasons, the district court did not err by extending the injunction beyond the life of the restrictive covenant. See id. at 93 (citations omitted) ("there may be situations where injunctive relief extending beyond the expiration of the period established by the covenant is appropriate.").
 
 II. Issues Raised By IGF
 
 62
 As suggested by the factual history, IGF's role in this case differed from that of the three individual defendants, particularly from the roles of Travis and Salzsiedler. Accordingly, IGF appeals from the district court's judgment on several issues other than those raised by the individual appellants.
 
 AGENCY
 
 63
 IGF first argues that the trial court should have entered a judgment notwithstanding the verdict for IGF on the grounds that the individual defendants were independent contractors and not the agents of IGF, as Overholt alleged. In the alternative, IGF contends that the trial court erred in refusing to submit the independent contractor issue to the jury and instead instructing the jury that IGF could be found liable if the jury found the individual defendants to be the agents of IGF. Under this alternative, IGF urges us to remand this case for a new trial.
 
 
 64
 Overholt's response is twofold. First, Overholt argues that IGF conspired with the individual defendants to interfere with Overholt's contractual relations. Thus, agency theory aside, IGF is guilty of conspiracy through the actions of its own officers and employees. Alternatively, Overholt contends that the trial court properly handled the agency/independent contractor issue.
 
 
 65
 In response to a special verdict question, the jury expressly identified IGF as being involved in the conspiracy to induce or otherwise cause a breach of Travis' employment contract with Overholt. Although IGF's role in the conspiracy may have been less blatant than that of Travis or Salzsiedler, our review of the record supports the jury's conclusion. The $4,000 draw received by Salzsiedler was unprecedented for a novice salesman and was actually twice the amount available to other salesmen who were already working for IGF. Virtually all of Salzsiedler's sales for IGF were made to former Overholt customers, and Salzsiedler sold more than 200 policies in six weeks, yet IGF did not investigate, let alone question, these phenomena. Moreover, shortly after Salzsiedler joined IGF and made his initial sales, IGF substantially raised Nielsen's draw, presumably because of his managerial success. Based on this evidence, Overholt convinced the jury that IGF participated in the conspiracy, and the record supports the jury's finding. Thus, we believe that the jury properly found IGF liable for wrongful interference with Overholt's contractual relations, independent of the agency theory to which IGF objects.
 
 DAMAGES
 
 66
 IGF next argues that the trial court erred by allowing the jury to award both compensatory and liquidated damages against IGF. According to IGF, this allowance erroneously allowed Overholt a windfall double recovery. IGF also claims that the liquidated damages provisions were not permissible in the first place.
 
 
 67
 In addition to the arguments concerning the liquidated damages provisions that the individual defendants raised, IGF also argues that the liquidated damages calculation grossly overcompensates Overholt for damages it suffered. IGF notes that as a broker, Overholt received only 35% of the premiums that were actually paid to the insurer, Home Farmers Mutual. Thus, while Overholt testified that approximately $424,000 in 1989 premiums were lost to IGF due to the defendants' scheme, its share of this loss was approximately $148,800. Moreover, after subtracting overhead costs from Overholt's actual share in lost revenue, Overholt's lost profit would be further reduced. Based on these facts, IGF concludes that the liquidated damages provisions are an unenforceable penalty and therefore void as a matter of law.
 
 
 68
 Once again, however, we note that the liquidated damages provisions compensate Overholt for the loss of potential renewals as well as for the immediate loss of 1990 premiums. Based upon the historically high retention rate and the automatic renewability of crop insurance policies, as well as on the loss of referrals, we find the liquidated damages provisions to be reasonable and not a penalty as IGF argues.
 
 
 69
 IGF also claims that the district court erred when it instructed the jury that it could award both liquidated and compensatory damages for Overholt's breach-of-contract claim. According to IGF, "the effect of a clause for stipulated damages in a contract is to substitute the amount agreed upon as liquidated damages for the actual damages resulting from the breach of the contract...." Dave Gustafson & Co., Inc. v. State, 83 S.D. 160, 156 N.W.2d 185, 187 (1968) (quoting 22 Am.Jur.2d, Damages, § 235).
 
 
 70
 In making this argument, IGF fails to note the precise language of the liquidated damages provisions. The employment contracts provided for liquidated damages "in the event of a breach of Paragraph 8 herein...." Paragraph 8 is reproduced in Part I of this opinion, and can accurately be characterized as the restrictive covenant component of the employment contract. According to the liquidated damages provisions, such damages were specifically designed to compensate Overholt for the violation of the restrictive covenant. There were, however, other conditions of the employment agreement for which no damages were stipulated. For instance, Paragraph 3 of the contract provided:
 
 
 71
 Employee agrees to devote full time and efforts exclusively to the performance of duties for the Company, subject to the direction and control of the Company, and agrees to diligently carry out duties within the territory or territories assigned by the Company from time to time during the agreement.
 
 
 72
 During the six-week period in which Salzsiedler sold IGF policies to more than 200 Overholt customers, Travis did not make a single sale. At the same time, Travis actively assisted Salzsiedler in establishing his presence in the crop insurance business. These facts indicate that Travis was not complying with Paragraph 3 of the contract. Travis' failure to diligently perform his job raises the question of whether the liquidated damages awarded to Overholt for Travis' violation of Paragraph 8 of his contract also compensated Overholt for losses incurred as a result of Travis violating Paragraph 3 of his contract.
 
 
 73
 The jury awarded Overholt more than $880,000 in liquidated damages. This figure resulted from doubling the premiums Overholt lost to IGF. Overholt testified that during 1989, however, it suffered more than $750,000 in cancellations in Travis' territory. Thus, more than $300,000 of the cancellations in Travis' territory were from farmers who did not switch their coverage to IGF, suggesting that it was Travis' neglect of his duty, which was outlined in Paragraph 3 of his contract, rather than his violation of the Paragraph 8 restrictive covenant, which caused these losses. Accordingly, the district court appropriately instructed the jury to determine compensatory damages in addition to calculating liquidated damages. In making this ruling, we note that the defendants never specifically objected to the special verdict questions nor the jury instruction, which together led to the award of compensatory damages.
 
 
 74
 IGF further contends that even if compensatory damages were permissible, it was inappropriate for the district court to allow Overholt's expert witness to present evidence of the costs incurred to recruit, train, and supervise the individuals chosen to replace Travis. According to IGF, these costs do not constitute unique losses suffered because of either the breach of contract by Travis or the wrongful interference with Travis' employment with Overholt. Instead, these expenses are a regularly incurred cost of doing business, since all employees must eventually be replaced, regardless of whether they breach restrictive covenants. IGF also claims that Overholt's expert witness should not have been allowed to calculate Overholt's damages over a thirty-year period beginning from the date of the actual breach of Travis' employment contract. IGF asserts that such a calculation is pure speculation.
 
 
 75
 IGF failed to object to this evidence at trial. IGF generally objected to the report compiled by Overholt's expert witness as lacking foundation and being speculative and conjectural, but it did not object to the specific evidence which it now claims is flawed. Moreover, IGF did not specifically object to the jury instruction that dealt with compensatory damages. Without such objections, these issues cannot be litigated on appeal.
 
 
 76
 After questioning at oral argument, IGF submitted a supplemental brief raising an additional liquidated damages issue. In this brief, IGF first noted that the liquidated damages provisions in the contract specifically apply only to business lost by Overholt as a result of Travis' activities after leaving Overholt's employ. IGF then noted that the jury based its award on Travis' activities during August and early September of 1989, at which time he was still working for Overholt. IGF thus concluded that the liquidated damages provisions do not apply to this case. We disagree.
 
 
 77
 Even though Salzsiedler contacted Travis' Overholt customers before Travis left Overholt, the cancellations of these customers' Overholt policies and their new IGF coverage did not take effect until after Travis left Overholt. The IGF policies sold by Salzsiedler provided coverage for the 1990 crop year. Until that time, the customers remained covered by their Overholt policies. Seen in this light, the effects of Travis' activities were not felt by Overholt until after he left the company. We recognize that a literal reading of the liquidated damages provisions would limit such damages to injury caused after Travis had left Overholt. In this case, however, we believe that while Travis was still under contract with Overholt during August and September of 1989, he had, for all practical purposes, ceased working for Overholt. This fact, in conjunction with the fact that the ramifications of Travis' activities were not felt until after he officially severed his relationship with Overholt, convinces us to uphold the award of liquidated damages in this case.
 
 CONCLUSION
 
 78
 We affirm the verdict and award of damages against the defendants.
 
 
 79
 BEAM, Circuit Judge, dissenting in part.
 
 
 80
 I join the majority opinion except for its discussion of damages. The district court in this case awarded: (1) liquidated damages pursuant to paragraph nine of Travis's contract for his breach of the restrictive covenant found in paragraph eight; (2) compensatory damages to compensate Overholt for some unspecified breach of Travis's contract; and (3) an injunction tailored to enforce the restrictive covenant for two years. Because I think that the district court's award of liquidated damages includes all the relief to which Overholt is entitled, I respectfully dissent.
 
 
 81
 South Dakota law is clear that liquidated damages substitute for proof of contractual damages. In Dave Gustafson & Co. v. State, 83 S.D. 160, 156 N.W.2d 185 (1968), the South Dakota Supreme Court explained that liquidated damages are generally awarded in place of actual damages.
 
 
 82
 "If a provision is construed to be one for liquidated damages, the sum stipulated forms, in general, the measure of damages in case of a breach, and the recovery must be for that amount. No larger or smaller sum can be awarded even though the actual loss may be greater or less."
 
 
 83
 Id. at 187 (quoting 22 Am.Jur.2d Damages § 235 (current version at § 726 (1988))). Accord Walter Motor Truck Co. v. State, 292 N.W.2d 321, 323 (S.D.1980) (when liquidated damages awarded, "evidence of the actual loss or harm suffered is irrelevant."). Cf. Chamberlain Livestock Auction v. Penner, 462 N.W.2d 479, 481, 485 (S.D.1990) (reversing trial court's award of damages in excess of liquidated damages provision). As a general rule, then, the district court should not have allowed evidence of compensatory damages in this case. The majority justifies the award by arguing that while the liquidated damages clause is limited to violations of the restrictive covenant, compensatory damages, by contrast, compensate Overholt for Travis's failure to devote his "full time and efforts exclusively to the performance of duties for" Overholt, as paragraph three of his contract requires. Ante at 1373. I respectfully suggest that this after-the-fact justification does not comport with either the nature of Travis's wrongful acts or the proof of damages at trial.
 
 
 84
 The majority holds that Travis could breach the restrictive covenant without breaching paragraph three. This is conceptually impossible. In essence, the restrictive covenant restrains Travis from doing what he did--encouraging Overholt customers to cancel their policies and procure new ones from another insurer. Paragraph three indicates that Travis agreed "to devote [his] full time and efforts exclusively to the performance of duties for [Overholt] ... and agree[d] to diligently carry out" Overholt's business. Appellants' App. at 91 (emphasis added). When Travis breached the restrictive covenant by delivering Overholt customers to IGF, he necessarily breached paragraph three requiring that he devote his full efforts "exclusively" to Overholt. While Travis could violate paragraph three without violating the restrictive covenant (e.g., by simply not servicing his customers or soliciting new ones), the converse cannot be true. That is, even if Travis breached the restrictive covenant yet serviced some of his remaining Overholt customers, he still would not be devoting his full efforts "exclusively" to Overholt. To the extent that paragraph three contractually sets forth a quasi-fiduciary duty, it is, with respect to breach of the restrictive covenant, redundant.[1] In effect, Overholt has been awarded both liquidated and compensatory damages for the same wrongful conduct. Liquidated damages provisions are provided for and upheld precisely to avoid conceptual problems of this sort.
 
 
 85
 Nevertheless, even if it were proper or possible to award compensatory damages for a separate and distinct breach of paragraph three, the proof at trial does not support such an award in this case. Neil Lapidus, Overholt's accountant, testified that he calculated the present value of Overholt's losses resulting from Travis's wrongful acts for the next thirty years to be $2,043,811. Trial Transcript at 590, 606; Exhibit 88. Lapidus similarly testified that the present value of Overholt's loss due to Nielsen's wrongful acts amounted to $439,610. Trial Transcript at 623; Exhibit 150. The problem, however, is that the jury was given no idea what part of these damages was already included in the liquidated damages award, and what part was due to Travis's supposed breach of paragraph three. Indeed, Lapidus did not even attempt to link his calculations to certain wrongful acts. As James Overholt testified about Lapidus's calculations:Q: So the calculations [of total cancellations], the figures Mr. Lapidus used, were caused by farmers dropping [their coverage with Overholt], for one reason or another, including of course, what was sold to IGF?
 
 
 86
 ....
 
 
 87
 A: Yes.
 
 
 88
 Trial Transcript at 1023-24.
 
 
 89
 The majority tries to establish a connection now, by suggesting that because not all the farmers from Travis's territory who cancelled in 1989 then purchased coverage from IGF, some of the cancellations must have been due to Travis's neglect of his duties to Overholt under paragraph three. Ante at 1373-74. As the majority suggests, the evidence does show a disparity between total cancellations in Travis's territory and cancellations (coverage) that were in essence transferred to IGF. Lapidus's calculations provided that total premium cancellations amounted to $692,445, while only $424,421 in cancellations were from Overholt customers who purchased new policies from IGF. See Trial Transcript at 1021-22; Exhibits 88, 189, 190; Yet nothing in the record, beyond conjecture, supports the majority's conclusion that the remaining $268,024 in cancellations were due to Travis's breach of paragraph three. Indeed, it is not at all clear that the jury even found a breach of paragraph three.[2] When James Overholt was asked whether there could "be several reasons why a person might cancel [a policy], aside from the fact that it was cancelled or transferred by what [could be] characterized as wrongful acts," he replied: "Well, sure. Policies can be cancelled for--for a number of reasons, and I guess the taint is something we're here about." Trial Transcript at 953. From my review of the record, this is as specific as the testimony ever got. Thus, James Overholt's admission that particular damages could not easily be linked to particular acts rings true.
 
 
 90
 Q: ... When you have violations of Paragraph 3 and Paragraph 8, do you have a way of determining which are--which acts lead to which damages?
 
 
 91
 A: No. It's--It's all intertwined. It's all difficult.
 
 Trial Transcript at 577-78.[3]
 
 92
 Nor was the jury instructed that it should award compensatory damages for cancellations resulting from Travis's breach of paragraph three. Rather, the jury was given almost no guidance in its award of compensatory damages. The special verdict form, after providing that the jury should calculate liquidated damages "due Overholt under Paragraph 9" simply allowed the jury to award further damages as it saw fit. In paragraph four, as indicated, the special verdict form provides, simply: "What additional amount of money would fairly and adequately compensate Overholt for its present and future damages resulting from Travis' breach of his contract?" Appellants' App. at 129. Nowhere was the jury told that it could award compensatory damages only for breach of contract other than that remedied by liquidated damages. Thus, the verdict form allowed the jury to award compensatory damages for the same conduct for which it awarded liquidated damages. This might not be a problem had the jury been instructed that it could award compensatory damages only for some breach of contract other than paragraph eight. But the court's instructions provided that the jury could award compensatory damages to remedy some unspecified conduct. See Trial Transcript at 2246-47 (" 'Compensatory damages' will consist of plaintiff's direct economic losses and out-of-pocket expenses resulting from the effect of the defendants' conduct on the plaintiff. In other words, the defendants are liable for all damages suffered by plaintiff that were proximately caused by defendants' conduct.... In determining compensatory damages, you may consider whether the plaintiff suffered any measurable loss of profits, as a proximate result of defendants' conduct.") (emphasis added). Given these uncertain instructions, the vague special verdict form, and no evidence connecting any of the cancellations to a breach of paragraph three, the proof of compensatory damages--even if properly submitted--cannot satisfy even the most liberal standard of certainty. Again, liquidated damages are provided for and upheld to avoid just this sort of problem.
 
 
 93
 Finally, I think that allowing an award of both liquidated and compensatory damages in this case makes the liquidated damages clause a penalty. The South Dakota Supreme Court has held that liquidated damages will be upheld
 
 
 94
 if it appears that at the time the contract was made the damages in the event of a breach will be incapable or very difficult of accurate estimation, that there was a reasonable endeavor by the parties ... to fix fair compensation, and that the amount stipulated bears a reasonable relation to probable damages and [is] not disproportionate to any damages reasonably to be anticipated.
 
 
 95
 Anderson v. Cactus Heights Country Club, 80 S.D. 417, 125 N.W.2d 491, 493 (1963). Accord Prentice v. Classen, 355 N.W.2d 352, 355 (S.D.1984). While the South Dakota Supreme Court does not look with disfavor upon liquidated damages, and while the validity of a clause is a question of law, liquidated damages will be construed as a penalty when they work an "unconscionable forfeiture." Id. Accord Walter Motor Truck, 292 N.W.2d at 324 (liquidated damages are penalty when they are "so disproportionate to the amount of any damage reasonably to have been contemplated when the contract was executed as to be oppressive"). In this case, the combined award of liquidated and compensatory damages plus injunctive relief becomes disproportionate to any damages reasonably contemplated.
 
 
 96
 As earlier indicated, Lapidus testified that the total gross premium loss for 1989 was $692,445, with $424,421 of this amount representing policies transferred from Overholt to IGF. See Trial Transcript at 1021-22; Exhibits 88, 189, 190. Even if this entire figure had been connected with a breach of contract, which it was not, it did not represent lost profits. First, Overholt was entitled to only 35.57% of this total amount, or $246,302. See Exhibit 88. Second, from Overholt's share, the salesman was entitled to a commission of ten to thirteen percent of the gross premium, depending on the type of coverage, a minimum of $69,245. Thus, without any further deduction for overhead, Overholt would have received something less than $177,000 in 1989 had things proceeded without any problems. Whatever the amount of Overholt's actual damages, if capable of calculation, the liquidated damages produced an award of over five times Overholt's lost agency commissions for 1989.
 
 
 97
 Further, the damages award affirmed by the majority gives Overholt the benefit of projected profits for thirty years on this sales territory without even replacing the salesman, Travis, or without exerting any future sales effort whatsoever. In addition, the majority also imposes a two-year injunction on Travis, Salzsiedler, Nielsen and IGF, delivering, so to speak, a triple whammy to the defendants. While the majority holds that the injunction protects Overholt against the loss of additional customers during the two-year restrictive covenant period, the liquidated damages award already compensates Overholt for this potential loss. Any future sales effort by Overholt, without competition from IGF, one of the major players in this phase of the insurance business, will result in unearned profits for Overholt coupled with punitive sanctions against the defendants.
 
 
 98
 Accordingly, I would vacate the district court's injunction and its award of compensatory damages. Overholt is entitled to $881,182 in liquidated damages as well as attorney's fees, but no more.
 
 
 
 [1]
 The precise damage amounts for which each defendant was held liable ranged from $1,072,000 to $1,119,991, with the defendants being held jointly and severally liable for the bulk of these amounts
 
 
 [2]
 In our opinion, the provisions at issue are best described as nondisclosure and nonsolicitation clauses
 
 
 [3]
 Paragraph 9 of the restrictive covenant provides:
 If, after termination of employee for any reason whatsoever and during the two year period from the effective date of such termination, a customer to whom the Company has provided insurance coverage during the 12-month period prior to the effective date of employee's termination either reduces the amount of insurance coverage or cancels insurance coverage with Company and obtains insurance coverage through the former employee or through any firm or person with whom the former employee becomes associated during said two year period, employee shall pay to the Company an amount equal to two times the annual gross premiums which was paid by such insured to the Company in the year immediately preceding such reduction or cancellation. Since an insured may elect differing insurance plans of coverage and alter his crop mix, the employee and the Company agree that it is impossible to determine with any reasonable accuracy the amount of prospective damages sustained by the Company in the event of a breach of Paragraph 8 herein.
 
 
 [4]
 Section 15-17-10 provides:
 Any provision contained in any note, bond, mortgage, or other evidence of debt for the payment of any attorney fee in case of default in payment or of proceedings had to collect such note, bond, or evidence of debt or to foreclose such mortgage is hereby declared to be against public policy and void.
 
 
 [5]
 Section 15-17-7 states:
 The court may allow attorneys' fees as costs for or against any party to an action only in the cases if it is specifically provided by statute, but nothing herein abridges the power of the court to order payment of attorneys' fees in all cases of divorce, annulment of marriage, determination of paternity or for separate maintenance and alimony, if the allowance of the same before or after judgment is warranted. Nor does anything herein abridge the power of the court to allow attorneys' fees from trusts administered through the court.
 
 
 [6]
 Like South Dakota, Minnesota permits the wronged party to recover its attorneys' fees where a contract provides for such recovery. See Barr/Nelson, Inc. v. Tonto's, Inc., 336 N.W.2d 46, 53 (Minn.1983)
 
 
 [7]
 Appellants do not argue that South Dakota law governs the permanent injunction issue
 
 
 [1]
 Overholt's amended complaint further illustrates my point. In count one, the complaint alleges breach of Travis's fiduciary duty "to act with the utmost good faith, integrity, and loyalty for the best interest of plaintiff." Appellants' App. at 141. The complaint also alleges, in the same sentence, breach of "a duty not to compete with plaintiff concerning the subject matter of the employment." Id. The complaint thus mixes what Overholt now contends are separate contractual violations and seeks contractual damages for both. Similarly, in count two, the complaint alleges that Travis breached the substance of both paragraph three and paragraph eight of his contract, and then seeks damages "and/or" liquidated damages for both. Id. at 143. Were the contractual violations as distinct as the majority suggests--distinct enough to permit separate damage awards--the complaint would be more clear, as would the evidence at trial
 
 
 [2]
 In its first section, captioned "TRAVIS BREACH OF CONTRACT," the special verdict form provides:
 
 
 [1]
 Did Travis breach his contract with Overholt (Exhibit 20)?
 IF YOU ANSWERED "YES" TO QUESTION NO. 1, THEN ANSWER QUESTION NOS. 2, 3, AND 4. IF YOU ANSWERED "NO" TO QUESTION NO. 1, PROCEED TO QUESTION NO. 5.
 
 
 [2]
 Did Travis breach Paragraph 8 of his contract with Overholt (Exhibit 20)?
 
 
 [3]
 If you answered "Yes" to Question No. 2, then answer this question: What is the amount of the liquidated damages due Overholt under Paragraph 9 of the Travis contract with Overholt (Exhibit 20)?
 
 
 [4]
 What additional amount of money would fairly and adequately compensate Overholt for its present and future damages resulting from Travis' breach of his contract?
 Appellants' App. at 128-29. Thus, the only specific reference to a part of Travis's contract, generally mentioned in question one, is the reference to paragraph eight in question two. The majority must contend, then, that the jury found a breach of paragraph three in its answer to question one. This seems no more likely than that the jury thought it must affirmatively answer the general question of breach of contract before it could make its specific finding on paragraph eight required by question two.
 
 
 [3]
 Overholt later seemed to contradict this testimony. When asked about his understanding of the liquidated damages clause at the time of his deposition, he replied that he understood that "all of the business which had been cancelled because it was tainted by the--by the acts of the defendants would be considered in our liquidated damages." Trial Transcript at 780. After the deposition, he realized that the liquidated damages clause "was actually referring only to the business that had actually transferred or been cancelled and had been written with IGF or people with whom Mr. Travis is associated." Id. See also id. at 828 (liquidated damages linked to "only those policies which have wound up with IGF"). The discrepancy proves nothing more than that James Overholt eventually read the contract correctly, for paragraph nine calculates damages based on customers who cancel with Overholt "and obtain[ ] insurance coverage through the former employee or through any firm or person with whom the former employee becomes associated." Appellants' App. at 92. Overholt's testimony quoted in the text still illustrates that those cancellations that were not transferred to IGF were not traced to a breach of paragraph three